Alice L. SOUDERS, Executrix of the estate of Earl L. Souders, Deceased, and Alice L. Souders, in her own right,

v.

The ATLANTIC RICHFIELD COMPANY, et al.

Civ. A. Nos. 87–1939, 88–2637.

United States District Court, E.D. Pennsylvania.

Sept. 10, 1990.

Hal F. Doig, Media, Pa., for plaintiff.

Faustino Mattioni, Philadelphia, Pa., for Atlantic Richfield Co.

Kenneth C. Frazier, Philadelphia, Pa., for John Crane Houdaille, Inc.

Albert John Snite, Philadelphia, Pa., for Celotex.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DITTER, District Judge.

Earl and Alice Souders filed this maritime action on April 3, 1987.[1] Plaintiffs allege Earl Souders contracted asbestosis during his career in the merchant marine aboard ships operated by The Atlantic Richfield Company ("ARCO") containing asbestos products manufactured by the remaining defendants ("asbestos defendants"). Defendants contend that the applicable three-year statute of limitations, 46 U.S.C. § 763a, bars this action. Upon consideration of the evidence introduced at trial, the arguments of counsel, and the post-trial briefs of the parties, I make the following:

### FINDINGS OF FACT

1. This action arises under the Jones Act, 46 U.S.C. § 688, and the law of admiralty. Jurisdiction is conferred upon this court by the Jones Act and 28 U.S.C. §§ 1331 and 1333.

2. From 1948 until his retirement in 1969, Earl Souders worked for ARCO as a seaman aboard a number of its vessels. During his tenure with ARCO, he claims he was exposed to various asbestos-containing products manufactured by the defendants.

3. After his retirement from ARCO, Souders was employed by E.I. duPont de Nemours & Company.

4. Souders smoked approximately one pack of cigarettes a day for some forty-five to fifty years beginning at age thirteen.

5. During duPont's routine annual physical examinations in the early 1970's, Souders' chest x-rays began to show signs of increased interstitial markings in the right lung. From 1975 to 1977, the x-rays showed a progression of bilateral linear markings. Linear and nodular bilateral interstitial densities increased again from 1978 to 1980.

---

1. Earl Souders is now deceased. Alice Souders, as executrix of his estate, was substituted for him as a plaintiff. She also sues on her own behalf.

6. On September 21, 1978, Souders completed a duPont questionnaire in which he admitted that he "worked with asbestos or dusty materials." duPont Confidential Health History at 3, Defendants' exhibit D–5.

7. Sometime in 1978, Souders consulted Dr. Peter Soraruf, a family practitioner in Chester County, Pennsylvania. Souders showed Dr. Soraruf the duPont x-rays. Dr. Soraruf noted the appearance of interstitial fibrosis in Souders' lungs.

8. In December, 1979, Dr. Soraruf again examined Souders. He decided that another x-ray of Souders' lungs was necessary. The x-ray revealed diffuse chronic interstitial fibrosis that was not much different than that seen in the 1977 x-ray. At that time, Dr. Soraruf discussed his findings with Souders.

9. On November 4, 1980, Souders returned to Dr. Soraruf because he was worried about the progression of the duPont x-rays and the corresponding deterioration of his health. Souders complained of shortness of breath and a productive cough. Dr. Soraruf referred Souders to Dr. Joseph Kestner, a board certified pulmonary specialist in Wilmington, Delaware.

10. Dr. Kestner examined Souders on November 5, 1980. Dr. Kestner's physical examination revealed that Souders had rales in his lungs and clubbing of his fingers; both ailments are associated, although not exclusively, with long-term exposure to asbestos. Dr. Kestner also reviewed the duPont x-rays as well as the x-rays ordered by Dr. Soraruf. He found that Souders' x-rays showed a progressive development of interstitial markings in both lungs.

11. Souders informed Dr. Kestner that he had worked for many years in an environment that contained asbestos, but, according to Dr. Kestner, Souders downplayed the extent of his contact with asbestos. Kestner exhibit 1.

12. Based upon his own examination, the x-rays, and Souders' history of asbestos exposure, Dr. Kestner reached an opinion to a reasonable degree of medical certainty that Souders had asbestosis. He discussed this conclusion as well as the findings which supported it with Souders at or about the time of the examination.

13. In a letter to Dr. Soraruf dated November 10, 1980, Dr. Kestner stated that "I think he has asbestosis. The clubbing, rales, radiographic findings and history of exposure support this." Kestner exhibit 1. Dr. Soraruf believes he spoke with Souders about this letter and Dr. Kestner's findings on one or two, or "even more," occasions. On each visit, Dr. Soraruf felt that Souders discounted his exposure to asbestos.

14. In August, 1981, Dr. Kestner recommended that Souders undergo a transbronchial biopsy to further define the nature of his illness.

15. Upon his admission to the Wilmington Medical Center, Wilmington, Delaware, on August 17, 1981, for this biopsy, Souders spoke with Dr. Jeffrey A. Stuckert, an attending resident. Dr. Stuckert's admission records reflect that Souders stated that he had been told that he had fibrosis in his lungs and that it was secondary to asbestos exposure. Exhibit D–1. Souders apparently minimized his exposure to asbestos-containing products. *Id.*

16. The transbronchial biopsy confirmed that Souders suffered from interstitial fibrosis, which can be caused by asbestos exposure. Dr. Kestner admitted that the biopsy results were consistent with an asbestosis finding. He suspects that he discussed the results with Souders before he left the hospital.

17. In the discharge summary dictated August 27, 1981, Dr. John J. Chabalko, an associate of Dr. Kestner's, wrote that "the exact etiology of his [Souders'] lung disease has not been determined prior to this admission, although one of the potential causes was asbestos. He has a long-standing cigarette smoking history.... The pathological diagnosis made at that time [the date of the biopsy] was interstitial fibrosis and chronic inflammation. No tumor or granuloma was seen. Cytology was negative. No acid-fast bacilli or fungi were seen on examination of the bronchial lavage fluid." Souders' exhibit B, attached to post-trial memo. The record does not

reflect whether Souders ever read or was apprised of the contents of the discharge summary.

18. Dr. Kestner did not believe that Souders' fibrosis was caused by smoking and at no time did he tell Souders that it was a cause.

19. Souders did not seek additional diagnostic assistance nor did he consult with an attorney, at least until sometime in late 1986, or early, 1987.

20. Souders was again examined by du-Pont's medical staff on December 22, 1981. The physician who saw him stated that "there is extensive interstitial fibrosis seen throughout both lungs.... These findings, although not diagnostic nor indicative of any specific condition or etiology, are consistent with changes which could be due to previous exposure to asbestos or other irritant materials." Exhibit D–3. The du-Pont medical records reveal that Souders was shown his x-rays and the findings were reviewed for his benefit by the du-Pont physician. *Id.*

21. In September, 1984, Souders suffered a heart attack.

22. Sometime either in late 1984 or early 1985, Souders was seen by Dr. Barry Hertz, a pulmonologist. Dr. Hertz summarized his findings in a letter to Dr. Soraruf. Dr. Soraruf testified that the letter referred to Souders' exposure to asbestos.

23. On June 25, 1986, Dr. Soraruf aided Souders in his application for Social Security benefits. Dr. Soraruf filed the physician's report for his application, which was forwarded to Dr. Soraruf after Souders provided the information and signature necessary to complete the applicant's section. The report states that "this 61 year old man has had asbestos exposure in the past and has had chronic interstitial fibrosis with chronic obstructive pulmonary disease over many years. In approximately

1978, this was picked up on a physical examination by chest x-ray at Wilmington Medical Center and he was seen in Wilmington by Dr. Ted Kestner who was a pulmonary physician and followed over the next four years. A lung biopsy was performed which showed asbestosis and chronic interstitial fibrosis. The patient progressed with his shortness of breath at intermittent respiratory infections and generally was disappointed with pulmonary physicians because he (sic) did not seem to be making him any better." Souders received Social Security benefits.

24. In July, 1986, Dr. Soraruf also filled out a physician's report for Souders' request for disability benefits. Soraruf–7. In it Dr. Soraruf remarked that "pt. [patient] has severe chronic lung disease [with] x-ray evidence of asbestosis and pulmonary fibrosis." *Id.* According to Dr. Soraruf, the symptoms of this illness arose in November, 1979. *Id.; see also* Soraruf–5. Souders signed the application and did not object to Dr. Soraruf's opinion.

25. At a 1986 summer reunion of his former ARCO shipmates, Souders learned from Darrow Tritt[2] that several of his shipmates had contracted asbestos-related diseases. Tritt told Souders that he should see a doctor or contact an attorney who could make the necessary arrangements for him. Tritt again saw Souders at a Christmas party in December, 1986. Tritt urged Souders to see a physician, but Souders refused.[3]

26. On April 2, 1987, after reconsidering Tritt's suggestion to consult a doctor or lawyer, Souders was examined by Dr. David Murphy, the chief pulmonologist at the Deborah Heart and Lung Clinic. Dr. Murphy diagnosed Souders' condition as asbestosis.

---

2. Tritt, Paul Hall, and Robert Doyle, Souders' shipmates, filed similar actions against these same defendants. The parties reached out-of-court settlements. Only this action proceeded to trial.

3. Tritt testified to his conversation with Souders at the Christmas party as follows:

> I asked him if he ever went to see a doctor and he said no and [I] made a smart remark telling him he ought to drop dead then. At that time he wouldn't ... [believe] ... he had anything. You couldn't convince him.

27. Souders filed this action on April 3, 1987.

28. Souders knew or should have known before April 3, 1984, that he had a disease that affected his lungs.

29. Souders knew or should have known before April 3, 1984, that his injury was caused by his exposure to asbestos while on the ARCO ships.

## DISCUSSION

Plaintiffs bring claims against ARCO for negligence and unseaworthiness and against the asbestos defendants for negligence and strict liability. These claims arise under the Jones Act. The statute of limitations for such maritime tort claims is 46 U.S.C. § 763a, which provides that:

a suit for recovery of damages for personal injury or death, or both, arising out of a maritime tort, shall not be maintained unless commenced within three years from the date the cause of action accrued.

Plaintiffs' claims are therefore barred if they accrued prior to April 3, 1984, three years before the date this suit was filed. Plaintiffs contend that their cause of action accrued on April 2, 1987, when Dr. Murphy diagnosed Souders' illness as asbestosis. Defendants argue that the cause of action accrued before 1984 when Souders possessed sufficient critical facts concerning his condition to put him on notice that he had an injury, interstitial fibrosis or asbestosis, that was caused by his exposure to asbestos.

The general rule is that a tort cause of action accrues at the time the tortious act is committed. On occasion, however, the plaintiff is not aware of his injuries and its cause until after the applicable statute of limitations would have run. The "discovery rule" allows a plaintiff to avoid the harsh effects of the statute of limitations. When the discovery rule applies, the cause of action does not accrue on the date the tortious act occurred, but on the date that the plaintiff, through the exercise of reasonable diligence, discovers or reasonably should have discovered both the injury and its cause. In other words, "the statute of limitations begins to run on the first date that the injured party possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress." *Zeleznik v. United States*, 770 F.2d 20, 23 (3d Cir.1985), *cert. denied*, 475 U.S. 1108, 106 S.Ct. 1513, 89 L.Ed.2d 913 (1986). Diligent investigation may require that the plaintiff seek further medical examination and competent legal representation. *United States v. Kubrick*, 444 U.S. 111, 123, 100 S.Ct. 352, 360, 62 L.Ed.2d 259 (1979). The burden is on plaintiffs to prove that the discovery rule applies and that the action was timely filed. *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 487 (3d Cir.1985).

The task at hand is to determine when Souders became aware of or had a reasonable opportunity to discover the critical facts of his injury and its cause. The evidence clearly shows that this occurred well before April 3, 1984. There really is no dispute over when Souders knew he was injured. Souders knew that he had interstitial fibrosis and in all likelihood had asbestosis no later than the end of 1981.

Souders first became aware of his condition in the 1970's upon the review of the many duPont x-rays which showed that his illness was progressing radiographically. He was well aware of the progressive deterioration of his health. In 1979 and 1980, his duPont physicians and Dr. Soraruf informed him of the serious nature of his condition and the presence of interstitial fibrosis in his lungs that appeared to be worsening. Dr. Soraruf even went so far as to discuss with Souders the possibility that his illness was asbestosis or, at the very least, undefined but related to his asbestos exposure. In November, 1980, Dr. Kestner provided Souders with all the facts he needed to conclude that he had been injured while working on the ARCO ships. Dr. Kestner told Souders that he had chronic interstitial fibrosis, which in Dr. Kestner's opinion was, in fact, asbestosis. Dr. Soraruf also relayed this information to Souders very shortly after he received Dr. Kestner's letter of November

10, 1980. Dr. Soraruf told Souders on other occasions that he had an asbestos-related injury. The fact that Souders knew that he was injured is highlighted by his discussion with Dr. Stuckert on August 17, 1981, during which Souders stated that he had fibrosis in his lungs "secondary to asbestos exposure." The transbronchial biopsy merely confirmed the existence of interstitial fibrosis in Souders' lungs. Given these facts, there is little doubt that Souders knew by the end of 1981 that he had been injured.

Plaintiffs contend that even if Souders knew he was injured in 1981, he did not know nor should he have known of the cause of his injury at that time. Rather, plaintiffs argue only after Dr. Murphy's asbestosis diagnosis could Souders be charged with sufficient knowledge of the cause of his lung disease. In order to accept this argument, however, I would have to ignore the overwhelming evidence to the contrary. I cannot do so. Souders' own words clearly show that he knew, although he tried hard not to believe it, that his exposure to asbestos on the ARCO ships caused his lung disease.

Without question, Souders knew in 1981 that:

1. he had been exposed to asbestos for a long period of time aboard the ARCO ships;

2. he had interstitial fibrosis that was getting worse and was causing him to be short of breath and suffer from a productive cough;

3. the biopsy results were consistent with interstitial fibrosis, if not asbestosis;

4. Drs. Kestner and Soraruf and his physician at duPont thought his lung disease was asbestos-related, if not asbestosis;[4]

5. his fibrosis was secondary to asbestos exposure; and

6. he was never told that cigarette smoking (nor anything else) could cause or had caused his injury. All of these facts should have lead Souders to conclude that he suffered from an asbestos-related illness caused by exposure to asbestos while employed by ARCO.

Plaintiffs make much of the fact that the transbronchial biopsy did not confirm the previous diagnosis of asbestosis. They argue, in effect, that the biopsy was so inconclusive as to negate Dr. Kestner's previous asbestosis diagnosis. By Dr. Kestner's own statement, this is not the case. First, the biopsy confirmed the presence of interstitial fibrosis. Second, the biopsy results were consistent with asbestosis or an asbestos-related injury. Third, and most important, Souders was never told that his fibrosis was not asbestos-related; he just closed his eyes and blamed it on his cigarette smoking.[5] Souders formed this unfounded opinion despite the fact that Dr. Kestner stated that he did not think cigarette smoking caused Souders' interstitial fibrosis and that he would not have told Souders that it did.

As the Supreme Court makes clear in *Kubrick,* if a plaintiff possessed those critical facts that would provide a reasonable person with knowledge of the cause of his injury, the statute of limitations is not tolled. 444 U.S. at 124, 100 S.Ct. at 360; *Barren by Barren v. United States,* 839 F.2d 987, 990 (3d Cir.1987), *cert. denied,* 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988). Here, Souders, possessed enough

---

4. It is not necessary that Souders know that his condition is asbestosis as opposed to interstitial fibrosis. Rather, Souders need only have known that he suffered from a lung disease caused by the asbestos to which he was exposed while on the ARCO ships. *See Cowgill v. Raymark Industries, Inc.,* 780 F.2d 324, 328 (3d Cir.1985) (applying Pennsylvania statute of limitations).

5. Even after his co-workers, Tritt, Hall, and Doyle, had told him of their asbestos-related injuries in 1986 and 1987, Souders still would

not believe that he had a similar condition. Tritt summed up Souders' attitude appropriately with his comment "that he wouldn't ... [believe] ... he had anything. You couldn't convince him." Souders' optimistic obstinance does not excuse his conduct, or more appropriately his lack of conduct. He should have known of the cause of his illness in 1981. The fact that in 1986 and 1987 he refused to acknowledge the obvious underscores his illogical behavior.

facts to know that his lung disease was caused by his exposure to asbestos.

Plaintiffs' counsel next argues that only a final and definitive diagnosis of asbestosis will start the running of the statute of limitations period. They contend that Drs. Kestner and Soraruf only provided Souders with a preliminary asbestosis diagnosis that was not confirmed until Dr. Murphy's examination in 1987. This, they argue, is not sufficient to put Souders on notice that he has an asbestos-related injury. This argument is incorrect for a number of reasons. First, an asbestosis diagnosis, tentative or final, is not necessary to begin the running of the limitations period. A finding that Souders' illness, whatever its medical definition, is asbestos-related is sufficient. *See supra* at 574, n. 4.

Second, plaintiffs' reliance on *Trieschock v. Owens Corning Fiberglas Company, Inc.*, 354 Pa.Super. 263, 511 A.2d 863 (1986), *alloc. denied*, 514 Pa. 617, 521 A.2d 932 (1987) to support their argument is also misplaced. In that case, as part of a routine medical check-up conducted by his employer in March, 1982, Trieschock was told by the company doctor that he was suspected of having asbestosis. Trieschock had not experienced any of the symptoms of asbestosis before that preliminary diagnosis was made.[6] On April 8, 1982, the asbestosis diagnosis was confirmed by an independent specialist. Trieschock filed suit on April 6, 1984. The court reasoned that:

> a plaintiff in a creeping disease case should not be required to have greater knowledge than his physicians about his medical condition. If those physicians are not reasonably certain as to his diagnosis, then he certainly cannot be bound to have the knowledge necessary to start the statute of limitations running.

*Trieschock*, 511 A.2d at 866. The court then held that the preliminary diagnosis was insufficiently certain to start the limitations period. *Id.* There is no such indication here. The evidence discloses that Drs. Kestner and Soraruf believed at the time they provided their asbestosis diagnosis in 1980 and 1981 they did so with a reasonable degree of medical certainty and that they told Souders as much. Souders should have known then that he was injured because of his exposure to asbestos and should have begun making arrangements to commence litigation within two years of that time. Instead, based upon his own misperception of what the biopsy confirmed and what the doctors told him, Souders chose to do nothing except to wait until the condition got worse.

Furthermore, counsel conveniently ignores that even if Drs. Soraruf and Kestner did not reach a definitive medical diagnosis, the *Trieschock* court also found that a tentative diagnosis activates a duty of due diligence to investigate further both the nature of the injury and its cause. *Id.* In order to fulfill this duty a plaintiff may be forced to undergo further medical treatment *and consult with an attorney. Kubrick*, 444 U.S. at 122–23, 100 S.Ct. at 359–60.[7] Souders did neither for approximately four years after the biopsy. In 1981, Souders was in possession of sufficient critical facts concerning his injury and its cause to trigger the duty of diligence to consult with an attorney. That duty did not depend upon his knowing that he had suffered a legally compensable injury or that his lung disease was definitely caused by the asbestos defendants.

---

**6.** This fact alone distinguishes this case from *Trieschock. See also Stauffer v. Ebersole*, 385 Pa.Super. 306, 560 A.2d 816, *alloc. denied*, 524 Pa. 622, 571 A.2d 384 (1989). Souders, unlike Trieschock, was very much aware of his illness and its objective symptoms. The fact that he had an injury could not have been a surprise to Souders.

**7.** In *Bickford v. Joson*, 368 Pa.Super. 211, 533 A.2d 1029 (1987), *alloc. denied*, 518 Pa. 647, 544 A.2d 959 (1988), the Pennsylvania Superior Court also held, relying on *Kubrick*, that the duty of due diligence may include a requirement that an attorney be consulted. The court opined that "in an era of complex and sophisticated legal rights and the general availability of legal services, the duty to make legal inquiry within two years of the injury is wholly reasonable." *Bickford*, 368 Pa.Super. at 216, 533 A.2d at 1031. *Accord Ackler v. Raymark Industries, Inc.*, 380 Pa.Super. 183, 551 A.2d 291 (1988).

In any event, I find that *Trieschock* confuses what is meant by medical certainty and legal certainty and for that reason is not worthy of consideration. *Trieschock* improperly, although understandably, equates the medical standard of reasonable certainty to the legal standard of proof necessary to file a viable lawsuit and toll the running of the statute of limitations. The two are vastly different. A physician makes a diagnosis so he can prescribe the right treatment. If he speaks too soon and is wrong with his diagnosis and treatment program, the results can be disastrous for his patient. The physician must take extraordinary care. There is great danger. On the other hand, the lawyer proceeds from a different viewpoint that requires him to act more quickly. He must comply with the statute of limitations or forever lose whatever chance his client had at compensation. The lawyer must err, if at all, on the side of filing a precipitous lawsuit. The harm in doing so may be significant, but, nevertheless, it pales in comparison to the health perils a misdiagnosed patient might face. The lawyer need not possess every fact that would convince a doctor, or for that matter, a jury, that his client suffers from a compensable injury in order to file a suit. The lawyer need only complete a rudimentary factual inquiry to satisfy pleading requirements. The lawyer has time on his side to develop and to strengthen his case, but only after he files the lawsuit. He knows that the rules of procedure afford him time for discovery, time for file review, time for expert examination, and time for trial. Thus, from the lawyer's standpoint, and accordingly, also from the client's perspective as well, a definite diagnosis of a particular injury and its cause is not required in order to bring suit. "All that ... [Pennsylvania precedent] ... requires is that the plaintiff knows he has an injury, or in the exercise of reasonable diligence, should have discovered that he has a creeping disease. So long as the claimant is aware that he has an injury there is no requirement that he be aware of a precise diagnosis as some language seems to suggest." *Ackler v. Raymark Industries, Inc.*, 380 Pa.Super. 183, 551 A.2d 291, 296–97, n. 3 (1988) (criticizing *Trieschock*'s definitive diagnosis requirement).

Here, Souders knew he had an injury and its cause no later than the end of 1981. An attorney, if consulted then or in 1982, or even 1983 or part of 1984, would have advised Souders to bring suit. No attorney was consulted until late, 1986, or early, 1987, and no suit was filed until April 3, 1987. The cause of action accrued more than three years before the filing date. Therefore, this action must be dismissed as untimely and judgment must be entered in favor of ARCO and the asbestos defendants.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the subject matter of this action.

2. Earl Souders knew or should have known before April 3, 1984, that he was injured.

3. Earl Souders knew or should have known before April 3, 1984, that his injury was caused by exposure to asbestos on ARCO ships.

4. The applicable statute of limitations, 46 U.S.C. § 763a, bars this action as it is not timely filed within three years of when Earl Souders knew or should have known of his injury and its cause.