

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-9-2003

# DeBiec v. Cabot Corp

Precedential or Non-Precedential: Precedential

Docket No. 02-2507

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"DeBiec v. Cabot Corp" (2003). *2003 Decisions.* Paper 15.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/15

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed December 8, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2507

MICHAEL ANTHONY DEBIEC,
ADMINISTRATOR OF THE ESTATE OF JANE
LOUISE GULDIN DEBIEC, DECEASED

v.

CABOT CORPORATION, INDIVIDUALLY AND AS
SUCCESSOR IN INTEREST TO CABOT BERYLCO, INC.,
KAWECKI BERYLCO INC., A/K/A KBI KAWECKI
BERYLCO INDUSTRIES, INC. & THE BERYLLIUM
CORPORATION; NGK METALS CORP, INDIVIDUALLY AND
AS SUCCESSOR TO THE BERYLLIUM CORPORATION,
KAWECKI BERYLCO INC. A/K/A KBI, KAWECKI
CHEMICAL CO., & BERYLCO, INC.

Michael Anthony DeBiec,
*Appellant*

No. 02-2508

SHARON J. REESER,
ADMINISTRATRIX OF THE
ESTATE OF GENEVA C. BARE, DECEASED

v.

CABOT CORPORATION, INDIVIDUALLY AND AS
SUCCESSOR IN INTEREST TO CABOT BERYLCO, INC.
KAWECKI BERYLCO INC.

a/k/a
KBI KAWECKI BERYLCO INDUSTRIES, INC., THE
BERYLLIUM CORPORATION; NGK METALS
CORPORATION, INDIVIDUALLY AND AS SUCCESSOR TO
THE BERYLLIUM CORPORATION, KAWECKI BERYLCO
INC.
a/k/a
KBI, KAWECKI CHEMICAL CO. BERYLCO, INC.

Sharon J. Reeser,
*Appellant*

------------

No. 02-2511

------------

DENNIS J. BRANCO, PERSONAL
REPRESENTATION OF THE ESTATE
OF JOHN C. BRANCO, DECEASED

v.

CABOT CORPORATION, INDIVIDUALLY AND AS
SUCCESSOR IN INTEREST TO CABOT BERYLCO, INC.
KAWECKI BERYLCO INC.
a/k/a
KBI KAWECKI BERYLCO INDUSTRIES, INC., THE
BERYLLIUM CORPORATION; NGK METALS CORP,
INDIVIDUALLY AND AS SUCCESSOR TO THE
BERYLLIUM CORPORATION, KAWECKI BERYLCO INC.
a/k/a
KBI, KAWECKI CHEMICAL CO. BERYLCO, INC;
BRUSH WELLMAN INC.

Dennis J. Branco,
*Appellant*

3

No. 02-2512

MARY I. RUSSO;
CHARLES F. RUSSO, H/H,

v.

CABOT CORPORATION, INDIVIDUALLY
AND AS SUCCESSOR IN INTEREST TO CABOT
BERYLCO, INC. KAWECKI BERYLCO INC.;
a/k/a
KBI KAWECKI BERYLCO INDUSTRIES, INC & THE
BERYLLIUM COPORATION C/O C.T. CORPORATION
SYSTEM; NGK METALS CORPORATION, INDIVIDUALLY
AND AS SUCCESSOR TO THE BERYLLIUM
CORPORATION, KAWECKI BERYLCO INC.,
a/k/a
BERYLCO, INC. C/O C.T. CORPORATION SYSTEM

Mary I. Russo;
Charles F. Russo, h/h,
                                        *Appellants*

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
D.C. Civil Nos. 01-2613, 01-2614, 01-2775, 01-2776
District Judge: Honorable Harvey Bartle III

Argued March 14, 2003

Before: BECKER, *Chief Judge*,* RENDELL and
AMBRO, *Circuit Judges*.

(Filed: December 8, 2003)

---

* Judge Becker completed his term as Chief Judge on May 4, 2003.

RUBEN HONIK (Argued)
JOSEPH J. URBAN
Golomb & Honik P.C.
121 S. Broad St.
Philadelphia, PA. 19107

*Attorney for Appellants*

KAREN M. CONNORS (Argued)
Cabot Corporation
Two Seaport Lane, Suite 1300
Boston, MA 02210-2019

NEIL S. WITKES
Manko, Gold, Katcher & Fox, LLP
401 City Avenue, Suite 500
Bala Cynwyd, PA 19004

*Attorneys for Appellee,
Cabot Corporation*

JAMES W. GICKING (Argued)
Marshall, Dennehey, Warner,
 Coleman & Goggin
1845 Walnut Street — 21st Fl.
Philadelphia, PA 19103-4717

*Attorney for Appellee,
NGK Metals Corporation*

---

## OPINION OF THE COURT

---

BECKER, *Circuit Judge.*

These personal injury and wrongful death cases, consolidated for discovery in the District Court and for disposition in this Court, stem from the deaths of four people, all of whom worked at and/or lived near the defendants' beryllium plant in Reading, Pennsylvania. Each of the deaths was traceable to Chronic Beryllium Disease ("CBD"), a result of exposure to that toxin, and the victims either brought or had brought on their behalf suits against the Cabot Corporation ("Cabot") and the NGK Metals Corporation ("NGK Metals").

Finding that Pennsylvania's two year statute of limitations had run on the plaintiffs' claims, the District Court granted summary judgment to the defendants and denied plaintiffs' motion for reconsideration. In so doing, the Court rejected plaintiffs' argument that the statute was tolled under the "discovery rule," which protects plaintiffs in circumstances in which, through no fault of their own, they do not discover their injury until after the statutory period would normally have ended. The plaintiffs argued that, as required by Pennsylvania law, they had each brought suit within two years of the date when they knew, or should have known, that their disease was beryllium-related. The defendants asserted, however, that the point at which these plaintiffs could have determined that their conditions were traceable to beryllium exposure, had they diligently investigated that possibility, occurred more than two years before each filed suit.

Concurring with the defendants, the District Court concluded that no reasonable person could find that any of these plaintiffs had exercised the "due diligence" in investigating their physical conditions required in order to avail themselves of the protections of the discovery rule, and that therefore the question whether the statute had run, usually a question for the jury, need not go to one. We disagree as to plaintiffs Jane Debiec, Mary Russo, and Shannon Reeser—based on the specific facts of each of these three cases, we conclude that reasonable minds could find that each of the decedents exercised due diligence in investigating her condition, and therefore the question whether the statute of limitations had run on their claims should have gone to a jury. The judgments of the District Court will be reversed as to Debiec, Russo, and Reeser, and their cases will be remanded for further proceedings. We conclude, however, that the fourth plaintiff, John Branco, failed to exercise due diligence, and we will therefore affirm the District Court's dismissal of his claim as time-barred.

## I.  Factual Background

Defendants Cabot and NGK Metals operate a beryllium manufacturing facility in Reading. They are successors to Kawecki Berylco Inc., which operated the facility for many

decades. Beryllium is a lightweight, high strength, tensile metal with a variety of industrial uses. It is also a toxic substance that can cause both cancer and a chronic scarring lung disease — CBD. The decedents in these cases spent much of their lives working and/or residing in close proximity to the plant, and each contracted CBD. Because the specific facts of each plaintiff's case are critical for determining whether the statute of limitations has run, we relate these facts in some detail.

## A. Jane Debiec

Jane Debiec ("Debiec") died in April 2000 at the age of 57. Her autopsy showed that the cause of death of was CBD. Her husband, Michael Debiec, filed personal injury and wrongful death claims in May 2001. From 1943 to 1961, as a child and youth, Debiec lived a mile or less from the defendants' plant. She began to have respiratory symptoms during her first pregnancy in 1976 and the symptoms recurred during her second pregnancy in 1978. At that point Debiec sought the advice of Dr. John Shuman, who recommended a lung biopsy. The biopsy revealed "granulomatous lung disease with significant fibrosis" and also detected 6.5 micrograms of beryllium per gram of dried tissue. Shuman's conclusion on the basis of this test was that Debiec was suffering from sarcoidosis, a granulotomous lung disease of unknown cause or origin.

When asked about the significance of the 6.5 micrograms of beryllium per gram of dried tissue found in Debiec's biopsy, Shuman testified "[i]t means there was not very much beryllium in the tissue. . . . Had there been a significant amount of beryllium in the tissue, I think one would certainly have to consider beryllium-induced lung disease. The fact that there wasn't any doesn't—did not mean that that wasn't a possibility, but it simply wasn't supportive of that. My clinical impression was otherwise and there just wasn't a reason to change it." SA at 525.

In 1980, the Debiecs told Dr. Shuman that they believed her illness might be related to exposure to zirconium. The parties dispute the meaning of the notes Shuman took on the Debiecs' 1980 visits; Debiec suggests that the notes

demonstrate that he and his wife were concerned only about zirconium at that time, while the defendants argue that the Debiecs were already considering litigation against the plant at that point and make much of the fact that Shuman recommended that they get a second opinion from one Dr. Israel, who was the "closest, most internationally known, expert on sarcoid." SA at 527. These notes are important, so we rescribe them at length:

August 26, 1980

> Her husband came in with her and I told them I have not come across any useful information regarding zirconium or talked to anyone who seemed to know very much about it. Mr. Debiec came armed with two publications from the Federal Register, issued from the Department of Health Education and Welfare. He has a number of lines underlined, which in reading areas that are not outlined, has the proverbial effect of lifting things out of context. One of the areas not underlined, for example, was "regulatory action was being taken with respect to cosmetic products based upon the lack of toxological data adequate to establish a safe level for use. . . . I talked with Dr. Lane who determined that the entire biopsy block had been sent to Kemron Environmental Services for silica, asbestos, and beryllium exposure. Only beryllium was tested . . . because of the small sample. Relevant to these other problems, Jane mentioned that she had previously lived in an area near Kawecki. As far as I am concerned at this time, there seems to be little reason to alter her clinical diagnosis of sarcoidosis. Under the circumstances, I will encourage her to perhaps, see Dr. Israel. . . . The evidence for zirconium-induced granulomas appears to be weak, although I could not deny the possibility. It seems unlikely that anything definitive will be able to be shown here. While Jane states that there is [not] any thought of litigation involved, I am rather skeptical about that. It would not surprise me to receive a legalized complaint in the future about our failure to analyze the biopsy for zirconium.

August 29, 1980

> I explained to her that her biopsy block was sent off for analysis for asbestos, silica, and beryllium, but [sic] was insufficient slides for all these tests. Following conversation with somebody, the beryllium study was done. Short of another biopsy, we cannot test for zirconium. She is more interested in having her symptoms treated than whether or not the problem was from zirconium since if it were so, the exposure doesn't exist anymore, and her treatment would not change and her symptoms would not behave differently if she knew that. Her husband, on the other hand, was somewhat disturbed at my answers . . . and, apparently did not feel he got a fair shake on his questions about zirconium. I, again, suggested to her that for peace of mind, it may be worthwhile, her seeing Dr. Israel to find out what he thinks about this possibility.

SA at 17-18.

We read these notes to mean several things. First, the Debiecs' (especially Mr. Debiec's) real concern in 1980 was zirconium, not beryllium. Second, Shuman was suggesting that Debiec see Dr. Israel about the possibility that zirconium, not beryllium, was causing her symptoms.[1] Third, the litigation Shuman was talking about was potential litigation against him and his group, not against the defendants in this case.

This last conclusion is arguably thrown into some doubt by Shuman's deposition, which included the following colloquy between Dr. Shuman and NGK Metal's attorney:

Q. And what litigation were you thinking about when you said that?

A. I mentioned in the same paragraph there, apparently, was some suspicion about where she had

---

1. The Debiecs never went to see Dr. Israel. When asked why, Michael Debiec testified that "Jane had confidence in Dr. Shuman. She had built up trust, a relationship. When she would have a meeting, she would come home and we would — I would say to her, how did it go. And she would always tell me that Dr. Shuman would give her a big hug when they left. And she wasn't about to go to see anyone else." SA at 501-502.

lived, that is, in the neighborhood of this Kawecki-Berylco at the time, so I guess that issue had arisen. . . .

Q. Looking at the August 26th, 1980 note, I see down at the bottom of that, the last sentence of that note, it says, quote, it would not surprise me to receive a legalized complaint in the future about our failure to analyze a biopsy for zirconium, period, closed quote. When you — what are you talking about when you — in that sentence? What does that mean?

A. Mr. Debiec is very persistent and I thought he may — would probably — I thought he might take one of his questions and just, you know, push it to this extent.

Q. Meaning filing a complaint against you and the group?

A. I guess that's what I — well, I guess I'm not sure who it would be directed against.

SA at 528.

We conclude that despite Shuman's initial assertion during his deposition that his notes meant that the Debiecs were considering filing a lawsuit against the defendants in 1980, those notes were referring to litigation that might be brought against him and his group.

The defendants draw our attention to a number of other events and facts that they argue have significance. For example, they point out that while at Penn State in 1990, Mr. Debiec's brother John wrote a research paper which discussed the possibility of a link between sarcoidosis and beryllium exposure, and which relied on a discussion of Jane Debiec's case. John Debiec testified that when he wrote that paper, he believed that Mrs. Debiec's condition was caused by beryllium. The defendants also point to a letter from a Colonel George W. Ward of the Army Medical Department that was attached to the paper. The letter stated that "Sarcoidosis is a non specific chronic granulomatous tissue response. Therefore, it is likely that there are many causes which can produce such non specific tissue response. One known cause is beryllium.

Whether other elements such as zirconium and aluminum can also cause this is speculative at this point." SA at 118.

Defendants also point to a 1992 Environmental Protection Agency ("EPA") public meeting in (nearby) Muhlenberg, Pennsylvania regarding the Reading plant. Michael Debiec spoke at that meeting and stated that ". . . I have been doing research on this for many years because my wife is seriously ill with a disease called sarcoidosis. And she lived in [nearby] Temple. And I done research for ten years, and I found out through different doctors that there's only one known cause of Sarcoidosis and pulmonary interstitialitis. And that comes from Beryllium." SA at 201. Mr. Debiec testified that after the meeting his wife told him that he was "crazy" for pursuing the idea that she may have had berylliosis. In response to defense counsel's question "Did you believe that her illness proved that breathing beryllium oxide was hazardous?", Mr. Debiec testified "I may have suspected it lightly, but that was only in the beginning. Later I did not. Once I talked to Dr. Shuman and he was emphatic. Whatever I did I did on my own." SA at 514-515.

In October of 1993, Mr. Debiec wrote to the Agency for Toxic Substances and Disease Registry ("ATSDR") and professed disappointment at the agency's handling of its study of the Reading plant. He wrote:

> I'm appalled and shocked that your investigative team could not come up with any other residents who are suffering from Beryllium related illnesses or who may have died as a result of Beryllium poisoning. . . . I'm tired of relating my wife's case to prove breathing beryllium oxide is extremely hazardous to one's health. She lived half a mile from the NGK plant on dry dirt. At the age of thirty-four she has one-third breathing capacity compared to a normal adult. A biopsy of her lungs shows that she has Beryllium in her lungs. . . . According to Dr. Lee Newman, an occupational medicine specialist at the National Jewish Center for Immunology and Respiratory Medicine, a very minute amount of Beryllium can cause the disease.

SA at 258-59.

The ATSDR's final report on the Reading plant was issued in June 1995. The report noted that some community residents were concerned that people "living in the Reading area may develop sarcoidosis from exposure to beryllium oxide." SA at 274. The report also observed that:

> Diagnosed cases of both acute and chronic beryllium disease have been extremely rare in recent decades. As of 1983, no cases of occupational berylliosis had been reported among individuals first exposed after 1973. With only one exception, no cases of CBD have been reported from indirect or nonoccupational exposure among individuals whose exposure began after about 1950. However, since CBD mimics the symptoms of sarcoidosis and may readily be confused with the latter disease, it is possible that additional, undiagnosed cases of CBD, masquerading as sarcoidosis, have occurred.

SA at 295.

The report concluded that while concentrations of beryllium had at times exceeded recommended levels near the plant, there was little public health hazard. It cautioned, however, that:

> if any adverse health effects occurred in response to higher off-site exposures in the past, they would probably be limited to CBD in a sensitive (i.e. immunologically predisposed) subpopulation living near the site. Since any past cases of nonoccupational CBD would likely have been misdiagnosed as sarcoidosis, long-term residents who have been exposed to clinically significant levels of beryllium in the past may want to consider consulting an occupational/environmental medicine specialist who can determine whether specialized testing for beryllium sensitivity is appropriate.

SA at 296.

Dr. Shuman did not alter his diagnosis of Debiec's condition, that she had sarcoidosis not CBD, during her lifetime. However, an April 2000 post-mortem diagnosis, made under the Case Registry of Chronic Beryllium

Disease, determined that Debiec had been suffering from CBD. Mr. Debiec filed suit in May 2001.

### B.   Mary Russo

Plaintiffs Mary and Charles Russo filed their action on May 24, 2001, alleging that Mrs. Russo ("Russo") had been diagnosed with CBD on June 25, 1999. Russo died on February 5, 2002; her death certificate identified the causes of death as respiratory failure, pulmonary fibrosis, and CBD.

Russo had worked at the defendants' beryllium plant in an office job, not in the actual plant itself, for between 18 and 20 months spanning the years 1946-48. After a month on the job, she developed breathing troubles. Her family doctor ordered her to stay at home for a thirty day period while he tried to determine the source of her difficulties. She later returned to work at a different part of the complex. After leaving her job at the plant, Russo lived and worked within miles of the plant for half a century.

In 1993, a routine examination determined that Russo had "[c]hronic interstitial fibrotic appearing changes . . . in both upper lungs. These are not changed appreciably from old films. The lower lungs show some very mild chronic interstitial disease." SA at 3. In February 1998, Russo underwent an examination by pulmonologist Dr. Richard Bell, who was aware that Russo had worked at the beryllium plant in the 1940s. His diagnosis stated that "I feel that the patient has an idiopathic pulmonary fibrosis. I do not believe it is related to the beryllium employment." App. at 76. Two weeks later, Russo contacted Dr. Bell again to ask if her lung condition might be related to breast cancer that had manifested itself in 1995. Dr. Bell told her that this was improbable and restated his view that "it was highly unlikely that this was related to her beryllium exposure approximately five (5) decades prior." SA at 77.

Russo testified that she was dissatisfied with her visit to Dr. Bell, and that "when I mentioned that I worked at Beryllium, there was a question in my mind now, because in the local papers they were having all different kind of articles coming up telling us about people that worked at

Beryllium and years later developing these symptoms." SA at 73-74. Russo went on to say that:

> So, when I told Dr. Bell this, what I thought, he said to me, It's so long ago, Mary. He says it can't be that or something to that effect 'cause that is a long stretch. But I wasn't happy with that. It bothered me because I heard people that didn't even work there had this. They didn't even have to work at the plant.

SA at 74. During her recovery from knee surgery in April 1998, Russo's lung condition worsened. On April 10, she had a 30 to 40 minute coughing attack and was admitted to the hospital for a week. During this hospitalization, Russo began treatment with a new doctor in Bell's group— Dr. Mengel. However, Russo's lung condition worsened throughout 1998 and by November of that year she required portable oxygen. Dr. Mengel testified that when he discovered that Russo had worked at the beryllium plant, it "rais[ed] an alternative diagnosis to idiopathic pulmonary fibrosis" and he considered the possibility that Russo had CBD. SA at 133. He also testified, however, that he did not change the diagnosis at that point because he "didn't have any evidence yet." *Id.* Dr. Mengel recalled that he had wanted to have a lung biopsy done on Russo for diagnostic purposes, but that she was so ill he feared it would have killed her. SA at 136.

The defendants point out that Russo began to collect newspaper articles on CBD "at some point" after her February 1998 visit to Dr. Bell. The articles they refer to were from the March 29 and April 12, 1999 *Reading Eagle*. The defendants also stress the fact that Russo asked both Dr. Bell and Dr. Mengel about the possibility that she had gotten sick as a result of her proximity to the Reading plant. Russo argues that it was as a result of reading the newspaper articles that she requested a beryllium lymphocyte proliferation test ("BeLPT"), the results of which became available on June 25, 1999 and confirmed that she had CBD.[2] The idea to take the test was her own. None of

---

2. The BeLPT is currently used in the diagnosis of beryllium sensitization and CBD. It involves culturing cells from the blood or lung in the presence or absence of beryllium and with a radioactive DNA precursor, tritiated thymidine. App. at 68.

her doctors raised the possibility that her condition was related to her employment at the beryllium plant some half century earlier. Dr. Mengel altered his diagnosis from idiopathic pulminary fibrosis to CBD only after the results of the BeLPT came back positive. He testified that this new diagnosis was based "primarily" on these results, and only "secondarily" on the fact that Russo had worked in and lived near the Reading plant. SA at 136, 138.

### C.  Shannon Reeser (Administratrix of the Estate of Geneva Bare)

Sharon Reeser brought her personal injury and wrongful death claims on June 6, 2001 as the administratrix of the estate of her mother, Geneva Bare, who died in November 2000 of CBD. Bare lived within two blocks of the Reading plant throughout most of her life. She began to experience difficulty with her lungs in the early 1990s, at which point she came under the care of a pulmonologist, Dr. Krol. One of Bare's daughters, Judith Forry, testified that she accompanied her mother to a doctor's appointment in the mid or late 1990s (she was unsure of the date and if the appointment was with Dr. Krol or with a Dr. Muvdi) and that her mother asked if berylliosis was a possibility, but that the doctor "really kind of put it off. He really didn't think it was important to her case. He said the test wasn't really accurate." SA at 199. Forry testified that her mother's question had been prompted by an article on berylliosis in the *Reading Eagle*, but that this was the first and only time Bare raised the issue of berylliosis until shortly before she died, when Bare was reminded of the possible link between beryllium exposure and lung disease by hearing that a neighbor had been diagnosed with CBD. SA at 200.

In their personal notes on her case, Bare's physicians raised the possibility that she had berylliosis. In 1996, for example, Dr. Krol wrote a letter to another of Bare's physicians stating that she:

> certainly has progressive interstitial lung disease and had significant interstitial lung disease as far back as 1977. . . . I don't know the cause of her interstitial disease. It certainly could be a form of idiopathic

> pulmonary fibrosis, berylliosis, sarcoidosis, even bronchiectasis. . . .

SA at 5. In an earlier letter regarding Bare, Dr. Krol had noted her "exposures at the beryllium plant," SA at 3, and in his January 1997 record of Bare's condition, he wrote that she had "[s]table pulmonary fibrosis since 1977" and that "[i]t has been slowly progressive[,] question of berylliosis." SA at 8. In July 1997, Dr. Krol again noted that Bare suffered from "Interstitial lung disease, possible berylliosis." SA at 8.

In response to an inquiry about the "question of berylliosis" language in Dr. Krol's January notes, Judith Forry testified that "Dr. Krol never recommended it could be [berylliosis]. That would be my mother's guess. . . . That would probably be my mother questioning him." SA at 208. A Dr. Stelmach also took notes on Bare's condition, in February 1999, and stated that she had a "longstanding history of interstitial lung disease and pulmonary fibrosis of undetermined etiology, although there is a very weak suggestion it is related to beryllium exposure, in that she lived in the area of the beryllium factory." App. at 108.

While it is clear that Bare's physicians thought berylliosis might be a possibility, Reeser testified that they never shared this with Bare herself. When asked if Dr. Krol or any other doctor had informed Bare of the possibility that her condition might be linked to her exposure to beryllium, she responded "my goodness, no." App. 110-111. Reeser asserts that she herself first became aware of the potential connection between her mother's illness and beryllium exposure in 2000, when one of her neighbors was diagnosed with CBD. App. 114-115. The presence of CBD was first confirmed during Bare's autopsy.

### D.   John Branco

John Branco ("Branco") worked at the Reading plant for 33 years and lived within a mile of the plant for most of his life. He died of lung fibrosis due to CBD in June of 1999.

In 1995, Branco began to have difficulty with his breathing, incident to exertion. In June of that year, he

received a letter from the Department of Health and Human Services ("HHS"), apprising him of a study the Department had conducted on the health of workers exposed to beryllium. The letter stated that:

> Before this study began, we knew that people exposed to beryllium may develop two forms of *beryllium disease*, acute and chronic. These are lung diseases caused by exposure to beryllium. . . . Our study, however focused on *lung cancer*. Some studies had linked lung cancer to beryllium exposure. However, this link was uncertain. . . . We found an increased risk of lung cancer in workers exposed to beryllium at all plants combined. . . . Chronic Beryllium disease and lung cancer may develop many years after the last exposure to beryllium. Thus, you and your doctor should be aware that you might have an increased risk of developing these diseases. . . . If you have lung or breathing problems that don't go away, see your doctor.

SA at 40-42. (Emphasis in original).

In February 1997, Branco received a chest x-ray, which revealed the presence of interstitial lung disease, the "etiology of" which was "uncertain." SA at 3. In May of 1997, Branco had cardiac bypass surgery. During his recovery, one of his cardiologists, Dr. Feater, noted that Branco "has had a chronic history of shortness of breath secondary to his berylliosis." SA at 10. In early August 1997, a second cardiologist, Dr. Politzer, wrote to Branco's personal physician advising him of Branco's condition, and stated that "the patient was felt to have respiratory failure secondary to chronic interstitial fibrosis which is most likely secondary to berylliosis, given the patient's thirty-five year work history with American Beryllium." SA at 17. Branco was referred to a pulmonologist, Dr. Mariglio, in August 1997. At this point, both Branco and Dr. Mariglio were suspicious about a potential link between Branco's condition and his exposure to beryllium. As a result, Dr. Mariglio referred Branco to Dr. Rossman, a berylliosis expert at the Hospital of the University of Pennsylvania.

In his letter to the University of Pennsylvania doctors, Dr. Mariglio wrote that his "Impression" was that Branco had

"progressive Interstitial Lung Disease with respiratory failure most likely berylliosis, rule out other forms Interstitial Lung Disease." On September 15, 1997, Dr. Mariglio wrote to Branco's personal physician that "due to his previous exposure to berylliosis, the most likely culprit initiating his Interstitial Lung Disease remains beryllium exposure." Dr. Rossman took x-rays and performed a BeLPT and a bronchoscopy with bronchoalveolar lavage ("BAL"). Neither the BeLPT, nor the BAL showed any evidence of response to beryllium. In his letter to Dr. Mariglio about these tests, Dr. Rossman wrote:

> As you can see from the enclosed results, there was no significant proliferation of either his blood or lung cells to beryllium sulfate or beryllium fluoride. Of note, the positive controls of the lung cells did not respond to the mitogens, PHA and Con A, or to the recall antigen, Candida, and therefore this is a technically unsatisfactory study. Transbronchial biopsy showed only mild chronic inflammation. Thus, these studies cannot confirm evidence of chronic beryllium disease being the cause of Mr. Branco's interstitial lung disease. Other causes must be considered such as bronchiolitis obliterans or idiopathic pulmonary fibrosis. It is recommended that Mr. Branco have a repeat bronchoalveolar lavage to definitively rule out beryllium disease since the lung proliferative results were technically unsatisfactory though negative.

App. at 96-97. Upon receipt of this letter, Dr. Mariglio called Branco and told him that "[h]is lymphocyte proliferation studies were negative for evidence of beryllium related disease" and that "[w]e will treat [you] as IPF." App. at 104. The testing process was physically debilitating for Branco, causing "deterioration . . . such that [] he developed increasing hypoxemia and required an overnight admission to the Hospital of the University of Pennsylvania." App. at 105. Already quite ill at that point, Branco made it clear that he did not want to undergo another round of tests with Dr. Rossman. App. at 105.

As a result of Branco's visit to Dr. Rossman, the Branco family's fear that his condition was beryllium-related evaporated. When asked whether Rossman's examination

had an effect on his thinking, Dennis Branco, the decedent's son, testified "Oh, yes. I didn't think he had berylliosis then." App. at 93-94.

## II. Legal Standard

### A.

We confront the question whether, given each plaintiff's specific history, the District Court properly found that their causes of action were barred by the statute of limitations.[3] Because "state tolling principles are generally to be used by a federal court when it is applying a state limitations period," *Vernau v. Vic's Market, Inc.,* 896 F.2d 43, 45 (3d Cir. 1990), in this diversity action we look to Pennsylvania law and predict how the Pennsylvania Supreme Court would decide this case. *See Bohus v. Beloff,* 950 F.2d 919, 924 (3d Cir. 1991).

Pennsylvania has a two year statute of limitations for personal injury and wrongful death actions. 42 Pa. Cons. Stat. § 5524(2). The question before us is, at what point did the plaintiffs' claims accrue? Generally, a claim accrues "as soon as the right to institute and maintain a suit arises," *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.,* 468 A.2d 468, 471 (Pa. 1983), which, in most tort actions, is at the moment the injury is sustained. In order to " 'ameliorate the sometimes harsh effects' of the statute of limitations," however, Pennsylvania courts have crafted an exception to this rule for situations in which a party, through no fault of his or her own, does not discover her injury until after the statute of limitations normally would have run. *Bohus*,

---

3. We exercise plenary review over a district court's grant of summary judgment and apply the same standard as the district court; i.e., whether there are any genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiffs. Fed. R. Civ. P. 56(c). *McNulty v. Citadel Broadcasting Co.,* 58 Fed. Appx. 556 (3d Cir. 2003). We are required to "view the record and draw inferences in a light most favorable to the non-moving party." *In re IKON Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir. 2002). The District Court had jurisdiction over these cases pursuant to 28 U.S.C. § 1332. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

950 F.2d at 924 (quoting *Cathcart v. Keene Indus. Insulation*, 471 A.2d 493, 500 (Pa. Super. Ct. 1984)). Latent disease cases often implicate this so-called "discovery rule," which tolls the statute. In this type of case, "the statute of limitations begins to run . . . when the plaintiff knows, or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *Cathcart*, 471 A.2d at 500. The burden is on the party claiming the benefit of the discovery rule to prove that she falls within it. *Dalrymple v. Brown*, 701 A.2d 164, 167 (Pa. 1997); *Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995).

In order to take advantage of the discovery rule, a plaintiff must have exercised "due diligence" in investigating her physical condition. *Bohus*, 950 F.2d at 924. We have explained that "[t]he 'polestar' of the discovery rule is not the plaintiff's actual knowledge, but rather 'whether the knowledge was known, or through the exercise of diligence, knowable to [the] plaintiff.'" *Id.* at 925 (quoting *O'Brien v. Eli Lilly & Co.*, 668 F.2d 704, 711 (3d Cir. 1981). The Pennsylvania Supreme Court has described the required diligence in this setting as follows:

> Reasonable diligence is just that, a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case. Long ago we recognized that there are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence.

*Cochran*, 666 A.2d at 249 (quotation marks omitted). The Court stressed that:

> [r]easonable diligence is an objective, rather than a subjective standard. Under this standard, the plaintiff's actions must be evaluated to determine whether he exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others.

*Id.* (quotation marks omitted).

In sum, the statutory time period begins to run in latent disease cases at the moment at which the plaintiffs possessed "sufficient critical facts to put [them] on notice that a wrong has been committed and that [they] need investigate to determine whether [they were] entitled to redress." *Zeleznik v. United States,* 770 F.2d 20, 23 (3d Cir. 1985).

In *Bohus,* we held that "[t]he question whether a plaintiff has exercised reasonable diligence is usually a jury question." 950 F.2d at 925. The Pennsylvania Supreme Court has cautioned, however, that while this question is "usually for the jury, . . . . [w]e also recognize the well established principle that where the facts are so clear that reasonable minds cannot differ, the commencement period may be determined as a matter of law." *Cochran,* 666 A.2d at 248.

## B.

While the parties agree on these basic legal standards, they disagree about how to apply them in this case and, more specifically, about how to measure the impact of a professional medical diagnosis on a court's evaluation of whether a plaintiff has exercised reasonable diligence in investigating her condition. This is an important issue here, because at some point doctors told each of the plaintiffs that it was *unlikely* they were suffering from CBD.

In support of their argument that the plaintiffs exercised reasonable diligence in these cases, Debiec *et al.* rely on a line of Pennsylvania cases, starting with *Trieschock v. Owens Corning,* 511 A.2d 863 (Pa. Super. Ct. 1986), that stands for the proposition that in determining when the statute of limitations begins to run, a plaintiff cannot be charged with having more information than his doctors have about his condition. The defendants counter that *Trieschock* and its progeny are no longer good law.

*Trieschock* involved a diagnosis of asbestosis. After a screening of employee medical results in March 1982, an Owens-Corning doctor informed Trieschock that he suspected he had asbestosis and that he had scheduled an appointment for him to see a pulmonary specialist.

Trieschock saw the specialist on April 8, 1982 and was definitively diagnosed with asbestosis. He brought suit against Owens-Corning on April 6, 1984. Owens-Corning argued that the statute of limitations had started to run in March 1982 when the company doctor told Trieschock of his suspicions, not in April when Trieschock received the definitive diagnosis. The Court disagreed, holding that:

> A plaintiff in a creeping disease case should not be required to have greater knowledge than his physicians about his medical condition. If those physicians are not reasonably certain about his diagnosis, then he certainly cannot be bound to have the knowledge necessary to start the statute of limitations running.

*Id.* at 866. While the initial conversation with the Owens-Corning doctor did not therefore start the statute running, the Court held that it "activated a duty on appellant's part to determine, with due diligence, whether he did, in fact, have that disease." *Id.*[4]

The defendants protest that *Trieschock* is no longer good law and point to language in *Ackler v. Raymark Industries, Inc.*, 551 A.2d 291 (Pa. Super. Ct. 1988), and *Souders v. Atlantic Richfield Co.*, 746 F. Supp. 570 (E.D. Pa. 1990), criticizing *Trieschock.* In *Ackler,* the Pennsylvania Superior Court observed in *dicta* that:

> In *Trieschock* [] the Court stated that a plaintiff in a creeping disease case is not required to have a greater knowledge than his physician about his medical condition, and if the physician is not reasonably certain as to the diagnosis, then a plaintiff cannot have the knowledge necessary to commence the running of the statute of limitations. We do not believe this is a correct statement of the law, as 'reasonable certainty' by a physician or the patient is not required by *Cathcart.* All that *Cathcart* requires is that the plaintiff knows he has an injury, or in the existence of

---

4. *Trieschock* has been followed by two other Pennsylvania cases, discussed *infra*: *Stauffer v. Ebersole*, 560 A.2d 816 (Pa. Super. Ct. 1989) and *Frisbie v. Wiseman*, 56 Pa. D. & C.4th 403 (Pa. Common Pleas 2001).

reasonable diligence, should have discovered that he has a creeping disease. So long as the claimant is aware that he has an injury there is no requirement that he be aware of a precise diagnosis as some language seems to suggest.

*Id.* at 296 n.3. *See also Groover v. Riddle Mem'l Hosp.,* 516 A.2d 53, 57 (Pa. Super. Ct. 1986) ("[Plaintiff] need not have known the precise medical cause of the injury in order to commence the running of the statute of limitations.") Similarly, in *Souders* the District Court noted that "I find that *Trieschock* confuses what is meant by medical certainty and legal certainty and for that reason is not worthy of consideration." 746 F. Supp. at 576.

In *Stauffer v. Ebersole,* 560 A.2d 816 (Pa. Super. Ct. 1989), however, decided after *Ackler* and *Groover,* the Pennsylvania Superior Court followed *Trieschock* and held that a preliminary diagnosis of an injury stemming from medical malpractice was not enough to start the statute running. More importantly, despite the criticism of *Trieschock,* this Court views itself as bound by its holding in *Bohus, supra,* where we stated that "lay persons should not be charged with greater knowledge of their physical condition than that possessed by the physicians on whose advice they must rely." 950 F.2d at 929. This endorsement is binding on this Court, notwithstanding the contradictory Pennsylvania Superior Court opinions on this issue. *See Smith v. Calgon Carbon Corp.,* 917 F.2d 1338, 1341, 1343 (3d Cir. 1990) (holding that in matters in which "we do not have the benefit of direct guidance from the Pennsylvania Supreme Court . . . [w]e are nevertheless required to 'predict the position which that court would take in resolving this dispute,'" and "in the absence of a clear statement by the Pennsylvania Supreme Court to the contrary or other persuasive evidence of a change in Pennsylvania law, we are bound by the holdings of previous panels of this court")(quoting *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 364 (3d Cir. 1990)).[5] We also cautioned

_____

5. At all events, defendants would have us read *Groover* and *Ackler* too broadly. *Groover* dealt with a situation in which, while the exact nature of the plaintiff's injuries was uncertain, it was clear from the outset that

in *Bohus*, however, that "[t]here is indeed some point in time when a patient's own 'common sense' should lead her to conclude that it is no longer reasonable to rely on the assurances of her doctor." 950 F.2d at 930. But, we added, "[i]n ascertaining this point in time, however, we are mindful that '[t]o put upon [a patient] the duty of knowing the nature of her ailment and its relation to her prior treatment before it is ascertained with a degree of certainty by the medical profession is a great burden to impose upon her.'" *Id.* (quoting *Stauffer*, 560 A.2d at 818) (second and third alterations in original).

To the extent that the defendants argue that a definitive diagnosis of CBD was not necessary to start the statute running, we agree; unrebutted suspicion that a claimant has a particular disease, which is an injury caused by another, is sufficient to start the clock. However, we also conclude that the fact that a definitive diagnosis is not necessary to start the statute running when a plaintiff suspects she has been injured and believes she knows the cause of her injury does *not* mean that when a doctor

---

she had suffered some kind of an injury caused by another, as she experienced severe pain after receiving an injection. We do not here confront a situation in which it was immediately clear that the plaintiffs had suffered an injury caused by another; the plaintiffs in the cases at bar developed illnesses over a long period of time and did not know from the outset that their condition was an injury caused by another. It made sense under the circumstances in *Groover* that the statute should begin to run as soon as the plaintiff was aware that she had been injured, not at a later point when she knew the exact nature of that injury, but the rule of *Groover* is not transferable to the cases at bar.

*Ackler* dealt with the question whether a plaintiff's signing of a workmen's compensation claim stating that he has asbestosis was sufficient to start the statute running. The *Ackler* plaintiff believed he had asbestosis, but had yet to receive a definitive diagnosis. The *Ackler* Court observed that "[i]t is not necessary that the exact nature of [the plaintiff's] injury be known so long as it objectively appears that [the plaintiff] is reasonably charged with the knowledge that he has an injury caused by another." 551 A.2d at 293. That situation is distinct from those we confront here, in that the instant plaintiffs either did not suspect that they had CBD or were told by their physicians that they did not.

affirmatively tells a claimant that she does not have a certain disease, and therefore that the defendant was not the cause of her injury, the fact that the claimant harbors her own suspicions to the contrary necessarily starts the clock as well.[6]

This conclusion is buttressed by the well-reasoned opinion in *Frisbie v. Wiseman*, 56 Pa. D. & C.4th 403 (Pa. Common Pleas 2001). This medical malpractice case was brought against a physician who mis-diagnosed cervical cancer as genital herpes. The plaintiff filed her complaint more than two years after she initially suspected that her diagnosis might be incorrect. The Court held that despite these suspicions, and the possibility that she could have sought a second opinion, the fact that the plaintiff's doctor and physician's assistant repeatedly assured her that she had herpes, not cancer, meant that the statute did not start to run until a second physician's assistant recommended a biopsy and the cancer was discovered.

In addition, in *Bohus* this Court held that a plaintiff's reliance on a doctor's assurances is reasonable as long as the plaintiff retains confidence in the doctor's professional abilities. In other words, a doctor's assurances that a plaintiff does not have a particular injury may toll the statute of limitations until that "point in time when a patient's own 'common sense' should lead her to conclude that it is no longer reasonable to rely on the assurances of her doctor." 950 F.2d at 930.

In sum, we conclude that this set of cases about the relationship between a claimant and her physicians stands for two propositions: (1) a definitive diagnosis of an injury

---

6. There is, of course, a distinction between a plaintiff's discovery of the precise medical nature of her injury and her suspicions about the cause of that injury. While we agree that a plaintiff's legal responsibilities are tied to the latter rather than the former, in the cases we confront here discovery of the precise medical nature of the injuries and the cause of the injuries are intertwined. If the precise medical nature of the plaintiffs' injuries was CBD, then the cause of their injuries was almost certainly the beryllium plant. If they were affirmatively told that they did not have CBD, then they had little reason to suspect that the beryllium plant was the cause of their injuries.

is not necessary to start the statute running; and (2) a definitive negative diagnosis may be sufficient in some cases to overcome the fact that the claimant harbored suspicions that she had a particular injury. Having laid out the basic legal standards applicable to all four cases, we turn to the specifics of each plaintiff's case.[7]

## III.   Application of the Legal Standard

### A.   Debiec

The defendants contend that the statute of limitations on Mr. Debiec's claim began to run "no later than July 22, 1992," the date of the public EPA hearing at which he spoke about his suspicion that his wife had berylliosis. Mr. Debiec counters that it was not clear that his wife's death was beryllium-related until an autopsy was performed after her death on April 12, 2000, and that the statute began to run at that point. The suit was filed on May 29, 2001.

The defendants point to a number of facts in support of their argument. Specifically, they urge that by the time she visited Dr. Shuman in August of 1980, Debiec was aware that her lung condition might be caused by exposure to an environmental pollutant, possibly beryllium. In addition, Mr. Debiec had undertaken significant research into the cause of his wife's ailment, and had received correspondence from Colonel Ward informing him that beryllium was one known cause of non-specific chronic

---

7. Debiec *et al.* also argue that summary judgment in their cases was inappropriate because it was not granted in two other "substantially similar" cases before the same District Judge—*Eda Anthon v. Cabot Corp.*, Civil Action No. 01-3969 (A204-214), and *Carolyn M. Koch v. Cabot Corp.*, Civil Action No. 01-5187 (A215)—which stem from the same general circumstances as the cases at bar.

While the facts in *Anthon* and *Koch* certainly bear a strong general resemblance to the facts of these cases, the District Court's rulings in those cases can have no impact on our evaluation of the instant cases. These determinations are individually tailored to the specific facts of each case, so the ruling in one case does not control what should be done in other cases.

granulomatous tissue. Defendants also draw our attention to Mrs. Debiec's brother-in-law John's research paper linking sarcoidosis to berylliosis, and to Michael Debiec's speech at the EPA meeting in July 1992, in which he discussed the possible links between sarcoidosis and beryllium. Finally, the defendants rely on the ATSDR report, which advised that CBD could "masquerade" as sarcoidosis.

Defendants urge that this information was more than sufficient to put Debiec on notice that she had an injury for which redress might be available, and argue that Debiec simply failed to use reasonable diligence to investigate her claims. They remind us that "a definitive diagnosis [of the injury] is not needed for the statute of limitations to run," and submit that the standard for reasonable diligence laid out in a number of Pennsylvania cases makes it clear that Mrs. Debiec's efforts were not sufficient for her to avail herself of the discovery rule.

The strongest of these cases, in defendants' view, is *Cochran v. GAF Corp.*, 666 A.2d 245 (Pa. 1995), which involved a wrongful death suit brought against manufacturers of asbestos-containing products. In June of 1981, Cochran, a steel worker, was admitted to the hospital with back pain. During his stay, doctors performed an analysis of his lung tissue and concluded that he had cancer. At the time, Cochran had been smoking one-and-a-half packs of cigarettes a day since 1947, and in response to this diagnosis he quit smoking. There was no discussion in 1981 that his cancer might have been caused by exposure to asbestos. In March 1985, Cochran was again admitted to the hospital after chest x-rays showed the presence of a mass in his lung, which turned out to be a tumor. Cochran's 1985 admission records made the first mention that his lung problems might have been related to asbestos. At that point, Cochran hired an attorney, who arranged for a doctor to examine Cochran's lung tissue in order to discover the cause of his malignancy. In August 1985, the examining doctor determined that the lung cancer was asbestos-related, and in September 1985 Cochran filed his complaint against the asbestos manufacturers.

They responded by moving for summary judgment on the ground that Cochran should have known his cancer was asbestos-related in 1981, and that therefore the 2 year statute of limitations on his claim had run. The trial court granted the motion and the Pennsylvania Supreme Court affirmed, holding that Cochran had not exercised due diligence in discovering the cause of his cancer. The Court reasoned that:

> The record indicates that there was ample evidence to support a diagnosis of asbestos-related lung cancer at that time. However, Mr. Cochran did not seek additional legal or medical help to ascertain the precise cause of his cancer until March of 1985. Appellant's sole explanation for this nearly four year lapse is the assertion that the decedent believed that his cancer was caused by his smoking habit, and he, accordingly, stopped smoking. There is no medical evidence in the record to support decedent's mistaken belief that his cancer was caused solely by his smoking.

*Id.* at 218.

While defendants lean heavily on *Cochran*, that case is distinguishable from Debiec's case in at least one key respect. In *Cochran*, the plaintiff was told he had cancer, and was told to stop smoking, but was apparently not told that his smoking had caused his cancer. Cochran himself came to that mistaken conclusion. In the case at bar, Debiec was told she had sarcoidosis, not CBD, and that it was very unlikely that her ailment had been caused by exposure to beryllium. Cochran knew he had an ailment whose origin could be discovered, but he chose not to take the necessary steps to make this discovery. Debiec was told that the cause of her ailment was not beryllium and therefore she did not have the same incentives as Cochran to pursue further research on her condition. Therefore, while we agree that *Cochran* creates a fairly high bar for what qualifies as reasonable diligence, we do not think it dooms Debiec's case.

Debiec, for his part, relies heavily on *Burnside v. Abbott Laboratories*, 505 A.2d 973 (Pa. Super. Ct. 1985), a case involving suits against pharmaceutical companies brought

by women who had suffered damage to their reproductive organs as a result of their mothers' ingestion of a drug called DES. The statute of limitations question in that case came up in relation to the suit brought by one of these plaintiffs, a woman named Ann Lynch. In August, 1979, Lynch was told by her OB-GYN, Dr. Allen, that she had a cervical stenosis. In that same month, Lynch's mother told her that she (the mother) may have taken DES while pregnant with Ann and that she had recently seen a television program in which a woman had stated that she had become "really sick" because her mother had taken DES while pregnant. Lynch then called her mother's obstetrician, Dr. Boal, who told her that her mother had indeed taken DES, but that there was no need to worry. Lynch also asked her own doctor if her ailments might be related to DES and he told her that they were not. In November, 1979, Lynch met with Dr. Allen for a post-operative visit and he again told her that there was no need to worry about DES.

Three months later, in February, 1980, Lynch saw a television show which discussed DES-related health problems, including abnormal skin growths, and which referred people with questions to local health clinics. Lynch recalled a polyp she had had removed in 1974 and called the Pittsburgh free clinic. She spoke to a medical social worker who told her that her ailments might be DES-related and who advised her to have a colposcopy. Dr. Allen told her the procedure was unnecessary. Nonetheless, Lynch contacted a lawyer at this point to discuss the possibility of litigation. She filed her action against the drug companies in March, 1982. A subsequent colposcopy revealed that Lynch had an undersized uterus and ovaries.

The trial court held that as a matter of law Lynch knew or reasonably should have known by September or November of 1979, more than two years before she filed her claim, that she had a DES-related injury, and that therefore her claim was barred. In so holding, the Court rejected Lynch's argument that she could not reasonably have known about the connection between her condition and DES until she saw the TV program and spoke to the social worker. The Superior Court reversed, agreeing with Lynch

and holding that while the plaintiff was obviously aware of her condition prior to September, 1979, it was not clear that it had been caused by DES. In coming to this conclusion, the court relied on the fact that two physicians had assured Lynch that DES was not involved, and that "[u]nder these circumstances, the application of the statute of limitations was for the jury." *Id.* at 989. The Court explained that "[i]t cannot be said as a matter of law that Lynch's acceptance of the opinions of two trusted physicians was unreasonable. In the face of these expert opinions, she could not be expected to know, or so a jury could find, that her physical difficulties were related to the DES . . . ." *Id.* at 990.

Defendants attempt to distinguish *Burnside* on its facts, arguing that "the plaintiff in *Burnside*, unlike Jane Debiec, was provided with neither a diagnosis nor any link between her abnormalities and DES during the limitations period." This attempt fails because Lynch *was* apprised of the potential link between DES and her condition by her mother during the limitations period; moreover, Debiec did not receive a diagnosis linking her condition to beryllium during the limitations period.

We believe that Debiec's situation more closely resembles the facts of *Burnside* than those of *Cochran*. Like Lynch in *Burnside*, Debiec's personal physician told her there was little or no reason to suspect that her condition was related to exposure to beryllium, and, like Lynch, it was family members who advised Debiec of the potential connection between her ailments and the toxic compound at issue. Indeed, it is safe to say that there was more public information available about the link between DES and Lynch's symptoms than there was linking beryllium and Debiec's symptoms. The only fact that may significantly distinguish *Burnside* from the case at bar is that Lynch sought a second medical opinion and Debiec did not. We are not, however, prepared to hold that reasonable diligence requires a plaintiff who has received a definitive diagnosis to seek a second opinion to determine the cause of her injuries.

The District Court agreed with defendants' analysis of the events in this case and concluded that Mr. Debiec could

not carry the burden of demonstrating that his lawsuit was timely. In so concluding, the Court relied primarily on the facts that Mr. Debiec and his brother suspected in the early 1990s that Mrs. Debiec's condition was beryllium-related, and that Mrs. Debiec knew about the emissions from the Reading plant. We are not persuaded by this analysis. It is clear that while at some point her husband and brother-in-law suspected that her condition was beryllium-related, Mrs. Debiec did not agree. Mr. Debiec testified that after the 1992 EPA meeting at which he discussed his belief that exposure to beryllium had caused his wife's condition, Mrs. Debiec told him that he was "crazy" for pursuing the idea that she may have had berylliosis. He also testified that his own suspicions about the possible link to beryllium never altered his wife's belief that she had sarcoidosis: ". . . what I suspected really didn't matter. That was all me. I was on a crusade. My wife believed she had sarcoidosis. She had faith and trust in her doctor." SA at 500. Mr. Debiec further testified that his suspicions about berylliosis eventually receded. In response to counsel for Cabot's question "Did you believe that her illness proved that breathing beryllium oxide was hazardous?", Mr. Debiec stated "I may have suspected it lightly, but that was only in the beginning. Later I did not. Once I talked to Dr. Shuman and he was emphatic. Whatever I did I did on my own." SA at 514-515.

For his part, it is clear that Dr. Shuman, a pulmonary specialist, did not think that Mrs. Debiec had berylliosis. In commenting on Mrs. Debiec's 1980 biopsy, Shuman wrote that "beryllium was tested . . . . Relevant to these other problems, Jane mentioned that she had previously lived in an area near Kawecki. As far as I am concerned at this time, there seems to be little reason to alter her clinical diagnosis of sarcoidosis." Shuman observed that the results of the biopsy, which revealed 6.5 micrograms of beryllium per gram of dried tissue, "mean[ ] there was not very much beryllium in the tissue. . . . Had there been a significant amount of beryllium in the tissue, I think one would certainly have to consider beryllium-induced lung disease. The fact that there wasn't any doesn't—did not mean that that wasn't a possibility, but it simply wasn't supportive of that. My clinical impression was otherwise and there just wasn't a reason to change it." SA at 525. Dr. Shuman

continued to believe that Debiec was suffering from sarcoidosis until her death, and he did not alter his diagnosis until that point. SA at 525.

It is true that, because Mr. Debiec was concerned that his wife's condition might have been caused by exposure to zirconium, Shuman informed Mrs. Debiec that "it may be worthwhile" to see Dr. Israel about that possibility, despite the fact that Shuman believed the "evidence for zirconium-induced granulomas appears to be weak." Mr. Debiec explained that they never went to see Dr. Israel because "Jane had confidence in Dr. Shuman. She had built up trust, a relationship. When she would have a meeting, she would come home and we would—I would say to her, how did it go. And she would always tell me that Dr. Shuman would give her a big hug when they left. And she wasn't about to go to see anyone else." SA at 501-502.

On the basis of these facts, particularly the fact that Mrs. Debiec had confidence in Dr. Shuman, who told her she did not have berylliosis (she believed him) and who consistently diagnosed her as suffering from sarcoidosis, we conclude that reasonable minds could differ on the question whether Debiec employed reasonable diligence in pursuing the cause of her injury. Therefore, it was error for the District Court to hold, as a matter of law, that the statute of limitations had run on Debiec's claim.

## B. Russo

Defendants argue that the statute of limitations began to run on Mary Russo's claim by April 12, 1999, the date on which Russo read a newspaper article linking the Reading beryllium plant to incidence of lung disease. The District Court agreed, holding that the fact that Russo had started to clip newspaper articles on the link between lung disease and the Reading plant meant that she suspected that her illness was beryllium-related in early 1999 and that therefore the statute of limitations had begun to run at that point. Russo urges that the statute did not begin to run until June 25, 1999, the day she received the results of her BeLPT confirming that she had CBD. This suit was filed on May 24, 2001.

Defendants assert that the discovery rule cannot save Russo's claim because she was both aware that she had an injury and had "made the link" between her injury and beryllium. We do not agree, because whatever suspicions Russo may have had on the basis of the articles in the *Eagle*, neither of Russo's physicians, certainly more credible and persuasive sources of medical information than the *Eagle*, endorsed her theories. Dr. Bell flatly stated that he did not believe Russo's condition was related to beryllium. Russo testified that when she raised the issue with Bell, he told her "[i]t's so long ago, Mary. . . . it can't be that . . . 'cause that is a long stretch." SA at 74. Dr. Mengel, less enthusiastically perhaps, endorsed this diagnosis. Indeed, he did not alter his diagnosis until the results of the BeLPT, which Russo herself requested, demonstrated that she was suffering from CBD.

As discussed above, a definitive diagnosis is not required to start the statute running. But this was not a situation in which there was a preliminary diagnosis supporting the possibility that Russo had CBD; rather, both her doctors told her she did not have CBD. On the basis of these negative diagnoses, we conclude that the District Court erred in ruling that reasonable minds could not disagree about whether Russo had pursued her claim with sufficient diligence.

## C. Reeser (Executrix of the Estate of Geneva Bare)

In granting summary judgment, the District Court noted that by the mid-1990s Bare had asked one of her doctors about the possibility that she had CBD, knew that she had lung disease, knew about emissions from the nearby plant, and "yet she took no further action." App. at 18. Reeser counters that it was not clear that Bare's condition was beryllium-related until an autopsy was performed after her death on November 2, 2000. The suit was filed on June 6, 2001.

The facts here are certainly close. It is clear that Bare's doctors were discussing among themselves the possibility that she had CBD, but Reeser stated that they never shared their suspicions with Bare, testifying that "it was

never related to her, because she would have related it right away to us." App. 113. The testimony of Bare's daughter, Mrs. Forry, is damaging to the case in that Forry stated that at some point her mother had asked a doctor if berylliosis was a possibility, a question that had been prompted by an article Bare had read in the local paper. Forry testified that the doctor had "put off " this question and told Bare that the test for berylliosis was unreliable, but it does not appear that he ruled out the possibility. This testimony hurts Reeser's case because it suggests that Bare knew about the possibility that she had CBD in the mid-1990s and that she did not pursue this possibility by getting the relevant tests. But Reeser counters that Forry's testimony was inconclusive as to *when* this incident actually occurred. When pressed on whether this event might have happened in the late rather than the mid-1990s, Forry said "It could have. I just don't remember. I honestly don't." SA at 213.

Defendants' argument rests on Forry's testimony; absent the conversation between Bare and her doctor, there is little reason to think that Bare suspected that she had berylliosis until directly before her death. If that conversation, which may have triggered Bare's duty to investigate the possibility that she had berylliosis, occurred more than two years before Reeser filed suit, then the suit may well be time-barred. If it occurred within the two-year period, however, the suit is permissible. Because Forry cannot remember when the key conversation took place, reasonable minds could differ about whether Bare pursued her claim with reasonable diligence. Therefore that question is for a jury to decide.

We add that, even if that conversation took place more than two years before Reeser filed suit, there is still the possibility that reasonable minds could differ on the question whether Bare exercised due diligence in pursuing her claim. In addition to telling Bare that "he really didn't think [the berylliosis issue] was important to her case," the doctor advised her that "the test wasn't really accurate." SA at 199. On the basis of this conversation, a reasonable person in Bare's situation could easily have surmised that further investigation of the possibility that she had

berylliosis would be unavailing because the then current testing methodology was inaccurate. This consideration too will have to be explored by a finder of fact.

### D.  Branco

Plaintiff John Branco argues that he justifiably relied on a negative result from a CBD test in deciding not to file suit. We are, however, persuaded that Branco should have suspected as early as 1995, and certainly by May 1997, that he suffered from CBD, and that the tests which followed, negative though they were, cannot support tolling in light of the doctor's warnings that the tests were technically unsatisfactory and that Branco should undergo further testing, and in the absence of assurance from his physicians that he did not have a beryllium-related disease.

Branco worked at the defendants' plant for thirty-three years (1950 to 1983) and lived nearby most of his life. In May 1995, Branco visited his doctor complaining of shortness of breath upon walking up hills or steps. Supp. App. at 1. One month later, he received a packet of information from the Department of Health and Human services, which included a letter informing Branco that it had studied the possible link between beryllium exposure and pulmonary diseases such as lung cancer and CBD. The letter stated in part:

> Chronic beryllium disease and lung cancer may develop years after the last exposure to beryllium. Thus, you and your doctor should be aware that you might have an increased risk of developing these diseases. . . . If you have lung or breathing problems that don't go away, see your doctor. Take the [enclosed] fact sheet *For Your Doctor* with you.

Supp. App. at 42. In addition to the fact sheet containing technical information for a patient's physician, the mailing also included a summary of the study's findings, and a document titled "Steps to Protect Your Health," which stated that "[t]he main symptoms of chronic beryllium disease are shortness of breath while exercising or walking, cough, fatigue, weight loss, or chest pain." App. at 45. We

conclude that these warnings were sufficient to put Branco on notice that he was at risk of contracting CBD.

By May 1997, Branco's shortness of breath had progressed to the point that he was admitted to the hospital. At that time he was advised he had mild berylliosis. His May 30, 1997, discharge summary noted Branco's "[h]istory of mild berylliosis." Supp. App. at 7. Branco was readmitted several times over the next six months, each time complaining of breathing problems, and each time doctors noted his history of berylliosis. His August 1997 discharge summary noted that "[t]he patient is a 76-year-old male with a 35 year history of working at American Beryllium," and his final diagnosis included the following: "[r]espiratory failure secondary to . . . [c]hronic interstitial lung disease likely related to berylliosis." Supp. App. at 14. This diagnosis was repeated in an August 10, 1997, letter from one of Branco's cardiologists to his treating physician, which also stated that arrangements were being made for Branco to undergo further testing at the University of Pennsylvania "in order to perform the needed specialized studies to diagnoses [sic] or rule out beryllium-related fibrosis." Supp. App. at 17.

On August 11, 1997, Dr. Joseph A. Mariglio, a pulmonologist who had examined Branco after referral by one of Branco's cardiologists, noted that Branco "had worked in the beryllium industry locally in Reading for 30 to 35 years," that "[m]any of his friends who worked in similar jobs were diagnosed as having berylliosis and have either died or are on therapy," and that he "lives in Temple[,] an area that surrounds many of the beryllium factories/plants in the Reading area." Supp. App. at 20. Dr. Mariglio noted his "impression" was Branco had "progressive Interstitial Lung Disease with respiratory failure most likely berylliosis . . . ." Supp. App. at 20.

On August 14, 1997, Branco canceled his scheduled tests. Dr. Mariglio wrote to Branco on August 19th, reiterating his belief that additional pulmonary testing was necessary to develop a more specialized treatment regimen of medication therapy, and warning additional delay would result in further deterioration of his condition. Dr. Mariglio wrote to Branco's cardiologist on September 15, 1997,

indicating that in an office visit that day Branco relented and agreed to undergo the necessary beryllium testing. In the same letter, Dr. Mariglio again stated that "[d]ue to his previous exposure to berylliosis, the most likely culprit initiating his Interstitial Lung disease remains beryllium exposure." Supp. App. at 23. d—d

These visits culminated in a September 1997 referral to Dr. Milton Rossman, a pulmonary expert at the Hospital at the University of Pennsylvania, at which time Branco submitted to a blood lymphocyte proliferation test (BeLPT) and a bronchoscopy with bronchoalveolar lavage. These tests were negative for berylliosis—Rossman's notes to Dr. Mariglio, the referring doctor, stated that "there was no significant proliferation of either his blood or lung cells to beryllium sulfate or beryllium fluoride." App. at 96. Critically, however, Rossman cautioned that

> the positive controls of the lung cells did not respond to the mitogens, PHA and Con A, or to the recall antigen, Candida, and therefore this is a technically unsatisfactory study. Transbronchial biopsy showed only mild chronic inflammation. Thus, these studies cannot confirm evidence of chronic beryllium disease being the cause of Mr. Branco's interstitial lung disease. Other causes must be considered such as bronchiolitis obliterans or idiopathic pulmonary fibrosis.

*Id.*

Branco asserts that these negative results were sufficient to toll the statute of limitations, and notes that Dr. Mariglio did not alter his diagnosis from idiopathic pulmonary fibrosis to CBD until after Branco's death.

We disagree. The information provided to Branco from the test results was hardly a definitive negative diagnosis for CBD. At most, those studies "[could not] confirm evidence of chronic beryllium disease being the cause of Mr. Branco's intersititial lung disease." This is not the same as ruling out the defendants' plant as the cause of the injury. Indeed, the pulmonologist who conducted the tests "recommended that Mr. Branco have a repeat bronchoalveolar lavage to definitively rule out beryllium

disease since the lung proliferative results were technically unsatisfactory though negative." Moreover, unlike the other plaintiffs dealt with in this opinion, Branco was never assured by his physician that he did not have a beryllium-related disease (and indeed he was advised that he did).

Unfortunately, the testing was physically difficult for Branco; he "had a febrile response after the lavage as he was about to leave the hospital and, concomitant with this, developed increasing hypoxemia." App. at 97. Branco was already very ill at this point and, in light of his negative reaction to the initial tests, he understandably did not want to endure a second round of tests which would make him sicker still. Yet Branco's poor health cannot justify equitable tolling, the purpose of which is to safeguard potential plaintiffs against causes of action they had no means of discovering. Here, even after the testing, Branco knew it was possible he had CBD, so if he considered further testing infeasible, the proper recourse was to file suit.

In sum, we think the June 1995 HHS warnings and the May 1997 advice that he had berylliosis were sufficient to put Branco on notice that he might have CBD, and to start the running of the statute of limitations. We do not believe that reasonable minds can differ on this point in the absence of assurance from his physicians that he did not have a beryllium-related disease.

### IV.  Conclusion

Because reasonable minds could disagree about whether Jane Debiec, Mary Russo, and Shannon Reeser exercised reasonable diligence in investigating their physical conditions, this question, and therefore the issue of whether the statutes of limitation have run in these cases, is for the jury. The judgments of the District Court will therefore be reversed as to these three plaintiffs, and their cases will be remanded. The judgment regarding John Branco will be affirmed.

AMBRO, *Circuit Judge*, concurring in part and dissenting in part:

## I. Introduction

I agree with the majority that these appeals raise important issues involving when a doctor's statements about (or even a diagnosis of) a plaintiff's illness in a latent injury case toll the statute of limitations under the discovery rule. According to well-settled precedent, the statute of limitations begins to run as soon as a plaintiff knows, or reasonably should know, that she has been injured and that her injury has been caused by another party's conduct. *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991) (citing *Cathcart v. Keene Indus. Insulation*, 471 A.2d 493, 500 (Pa. Super. Ct. 1984)). "The plaintiff need not know the exact medical cause of the injury; that his injury is due to another's negligent conduct; or that he has a cause of action." *Bohus*, 950 F.2d at 924-25 (internal citations omitted). Rather than actual knowledge, "[t]he 'polestar' is . . . 'whether the knowledge was known, or through the exercise of diligence, knowable to [the] plaintiff.' " *Bohus*, 950 F.2d at 925 (quoting *O'Brien v. Eli Lilly & Co.*, 668 F.2d 704, 711 (3d Cir. 1981)). To that end, "[e]very plaintiff has a duty to exercise 'reasonable diligence' in ascertaining the existence of the injury and its cause." *Bohus*, 950 F.2d at 925.

The Pennsylvania Supreme Court has defined "reasonable diligence" as

> a reasonable effort to discover the cause of an injury under the facts and circumstance[s] present in the case. Long ago we recognized that "[t]here are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful."

*Cochran v. GAF Corporation*, 666 A.2d 245, 249 (Pa. 1995) (internal citations omitted). Reasonable diligence is an objective standard. *Id.* A plaintiff "must exercise only the level of diligence that a reasonable man would employ under the facts and circumstances presented in a particular case." *Id.* "[A] diligent investigation may require

one to seek further medical examination as well as competent legal representation." *Id.* (citations omitted).

While "whether a plaintiff has exercised reasonable diligence is usually a jury question," *Bohus*, 950 F.2d at 925 (citation omitted),

> [t]here is indeed some point in time when a patient's own "common sense" should lead her to conclude that it is no longer reasonable to rely on the assurances of her doctor. In ascertaining this point in time, however, we are mindful that "[t]o put upon [a patient] the duty of knowing the nature of her ailment and its relation to her prior treatment before it is ascertained with a degree of certainty by the medical profession is a great burden to impose upon her."

*Id.* at 930 (internal citations omitted). More succinctly, " 'reliance upon the word of one physician when the patient's own common sense should lead to a different conclusion is unreasonable.' " *Id.* At 925 (quoting *DeMartino v. Albert Einstein Medical Center*, 313 Pa. Super. 492, 506 (1983)).

These principles of Pennsylvania law, when applied to the varied facts of these cases, lead to differing results. Despite physicians' statements pointing to or diagnoses of illnesses other than chronic beryllium disease ("CBD"), many of the plaintiffs still strongly suspected or had notice their extended exposure to the defendants' beryllium plant was the source (or cause) of their various lung ailments. For those plaintiffs, the time to sue began and they were required within that time to exercise reasonable diligence to discover the true cause of their health problems and to file suit to protect their legal rights. The limitations clock stopped if a doctor's diagnosis or statements affirmatively dissuaded due diligence from being exercised by a putative plaintiff *and* that inaction did not run counter to common sense.

Put another way, if a plaintiff had symptoms of lung disease, and had reason to believe the defendants' beryllium plant caused that injury — whether the information was obtained from a doctor, medical study, government letter, or possibly a media story — the statute

of limitations began to run. Pennsylvania's discovery rule tolled the limitations period only if a physician definitively informed a plaintiff that she did not have an illness caused by beryllium (and, *a fortiori*, the defendants' plant) *and* common sense did not make her reliance unreasonable.

In this context, I join fully the majority's opinion as to John Branco, concur in the result reached as to Geneva Bare and Mary Russo, and dissent as to Jane Debiec. Although I would only decide one case differently than the majority (Debiec), I believe the facts of another (Russo) are closer than the majority acknowledges.

## II.   Application of Pennsylvania Law to Debiec Case

The majority examines Jane Debiec's health history at great length but, in doing so, disproportionately relies (in my view) on the diagnosis of her treating physician, Dr. John Shuman. The majority notes Dr. Shuman diagnosed Mrs. Debiec with sarcoidosis in 1978, told her it was unlikely the cause was beryllium, and maintained this diagnosis until her death in April 2000. Although there is no evidence that Mrs. Debiec made any further effort to investigate what caused her sarcoidosis during the interim two decades — despite her husband's publicly expressed belief during this time that it was caused by the defendants' plant — the majority concludes reasonable minds could differ as to whether Mrs. Debiec exercised reasonable diligence in discovering the cause of her injury. I do not agree.

As an initial matter, while Dr. Shuman did inform Mrs. Debiec many years ago it was unlikely her illness was caused by beryllium, the record does not indicate he continued to assure her over the years that the defendants' plant was not the source of her sarcoidosis. Dr. Shuman recommended Mrs. Debiec undergo a lung biopsy in 1978 when she was experiencing respiratory difficulty during her second pregnancy. In his deposition testimony, taken in February 2002, Dr. Shuman stated that he ordered the biopsy tissue tested for beryllium because he was aware she was living near the defendants' plant. The test revealed beryllium in her lung tissue, but not in amounts significant

enough to consider diagnosing Mrs. Debiec with beryllium-induced lung disease, although Dr. Shuman stated he could not rule it out as a possibility. Besides an unheeded recommendation in 1980 to seek a second opinion whether zirconium was the cause of Mrs. Debiec's sarcoidosis (in response to Mr. Debiec's questioning on this point), there is no evidence that Dr. Shuman at any time in the succeeding twenty years again considered or discussed, much less rejected, the possibility of a causal connection between the defendants' plant and Mrs. Debiec's declining health. In fact, Dr. Shuman testified he did not recall Mr. Debiec ever directly asking him if his wife's condition was caused by the defendants' plant, and was even surprised when he learned at Mrs. Debiec's funeral that Mr. Debiec suspected as much.[1]

But while Dr. Shuman may have had no reason to revisit his initial diagnosis that Mrs. Debiec's sarcoidosis was unrelated to beryllium, she had ample facts to suspect her illness was caused by exposure to the defendants' plant. In June 1990, John Debiec, Mr. Debiec's brother, wrote a research paper while at Pennsylvania State University titled "The Environmental Impact of the NGK Metals Facility on the Local Community." The paper anonymously referred to Mrs. Debiec's case and mentioned that, because she lived near the defendants' beryllium plant, she may actually suffer from CBD, not sarcoidosis, and hypothesized her case indicated a relationship between sarcoidosis and CBD. John Debiec also attached to the paper a copy of his sister-in-law's biopsy report with her name redacted. John Debiec testified in his deposition that at the time he wrote the report he suspected emissions from the defendants' plant caused Mrs. Debiec's condition and that he shared his belief with Mr. Debiec, but not Mrs. Debiec.

On July 22, 1992, the Environmental Protection Agency (EPA) held a public meeting in Muhlenberg, Pennsylvania,

---

1. In response to a question about whether Mr. Debiec, or anyone else on his behalf, ever asked Dr. Shuman if Mrs. Debiec's condition was caused by the defendants' plant, Dr. Shuman replied: "I don't recall anybody asking me that. I subsequently became aware that he was thinking that and that was at her funeral, which sort of caught me off guard. I didn't realize that he thought about it that strongly."

regarding health issues and the defendants' plant. Jane, Michael, and John Debiec all attended. The transcript of the meeting indicates Michael Debiec (Mrs. Debiec's husband) asked the following:

> Does the NGK Company have any — in this plan of recovery and fixing, are they going to make any restitution to people who probably have grieved [sic] this since the 1950s and '60s and have been seriously ill with some type of disease that's caused by beryllium, cadmium, or anything else?

Mr. Debiec also stated that

> . . . I have been doing research on this for many years because my wife is seriously ill with a disease called sarcoidosis. And she lived in Temple. And I [have] done research for ten years, and I found out through different doctors that there's only one known cause of sarcoidosis and pulmonary interstitialitis. And that comes from beryllium.

In October 1993, Mr. Debiec wrote a letter to the Agency for Toxic Substances and Disease Registry (ATSDR), apparently in response to his having reviewed a copy of its draft report. His letter strongly criticized the ATSDR's investigatory effort to find a causal connection between the defendants' plant and the illnesses of local residents.

> I hope this is the last letter I have to write to any government agency concerning my wife's illness and the adverse effects of Beryllium plants across the United States.
>
> * * * * *
>
> I'm appalled and shocked that your investigative team could not come up with any other residents who are suffering from Beryllium related illness or who may have died as a result of Beryllium poisoning.
>
> * * * * *
>
> I'm tired of relating my wife's case to prove breathing Beryllium Oxide is extremely hazardous to one's health. She lived half a mile from the NGK plant on [redacted] in Temple for half of her life. She breathed

the air and played in the dry dirt. At the age of thirty-four she has one-third breathing capacity compared to a normal adult. A biopsy of her lungs shows that she has Beryllium in her lungs. How much Beryllium dust does it take for a person to lose two-thirds of their [sic] breathing capacity?

\* \* \* \* \*

In my opinion, the bottom line is this, if your team had done an adequate investigative job, interviewing the right people, the report should have stated that the residents of Muhlenberg Township who live within a radius of five miles from the NGK plant are getting ill, have been getting ill and will continue to get ill. They may not get a breathing disorder such as Sarcoidosis or Berylliosis. Brain tumors and certain cancers have become prevalent to some residents who live near the plant.

The final ATSDR report on the Reading plant was released in June 1995, and stated that "since CBD mimics the symptoms of sarcoidosis and may readily be confused with the latter disease, it is possible that additional, undiagnosed cases of CBD, masquerading as sarcoidosis, have occurred." The report also recommended that "long-term residents who have been diagnosed as having sarcoidosis and who suspect that they may have been exposed to clinically significant levels of beryllium in the past may want to consider consulting an occupational/environmental medicine specialist who can determine whether specialized testing for beryllium sensitivity is appropriate."

The majority cites portions of this same evidence and concludes it proves only that Mr. Debiec and his brother suspected Mrs. Debiec's condition was beryllium-related, but she did not agree, and opted instead to rely on Dr. Shuman's diagnosis. But whether Mrs. Debiec agreed with her husband is not relevant. "[T]here are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which would be successful." *Cochran*, 666 A.2d at 249 (internal citation omitted). Layer upon layer of strong

evidence compiled by Mr. Debiec and his brother, acquired in part from Government sources, demanded Mrs. Debiec exercise reasonable diligence to investigate further. A "diligent investigation may require one to seek further medical examination as well as competent legal representation," *id.*, and Mrs. Debiec sought neither.

I agree with the majority that usually a claimant may rely on the assurances of her doctor instead of the suspicions of her spouse. But that is not what happened here. There is no evidence that, in the twenty years after Dr. Shuman first told Mrs. Debiec it was unlikely her sarcoidosis was caused by beryllium, he ever reiterated this opinion in response to an inquiry based on the growing body of evidence to the contrary. While the discovery rule may have tolled the clock initially, "that the statute of limitations is tolled does not mean it is no longer applicable." *Bohus*, 950 F.2d at 926. The record overwhelmingly demonstrates that by the mid-1990s Mr. Debiec believed (and Mrs. Debiec knew of this belief), on the basis of his extensive information-gathering, that his wife's illness was beryllium-induced and was caused by the defendants' plant. Mrs. Debiec chose to ignore this information and engaged in no further investigation. It is possible she merely wanted to enjoy her remaining years free from the burdens of a prolonged search into the cause of her illness. This was her prerogative, but reasonable diligence is an objective, not subjective standard. *See Cochran*, 666 A.2d at 249. Although Dr. Shuman never altered his original diagnosis, in later years, when sources such as the ATSDR were advising that CBD may masquerade as sarcoidosis, Mrs. Debiec no longer could ignore that the defendants' beryllium plant may have been the cause of her injury. Indeed, even if we ignore all the warnings of her illness' source prior to the ATSDR report, it alone triggered the two-year limitations period in which to attend to her legal rights.

The District Court concluded the facts are so clear in this case that reasonable minds cannot differ on the question whether Mrs. Debiec exercised reasonable diligence in attempting to discover the cause of her injury. Mr. Debiec filed suit on behalf of his wife on May 29, 2001, nearly

eight years (under the most generous interpretation) after she knew or should have known of the defendants' alleged involvement in causing her illness. Accordingly, I would affirm the District Court's ruling that this suit is time barred.

### III.   Other Plaintiffs

I concur in the result reached by the majority in the case of Geneva Bare, who died on November 2, 2000. Suit was filed by her daughter and administratrix, Sharon Reeser, on June 6, 2001. The District Court relied almost entirely on the fact that Judith Forry, another of Bare's daughters, testified in her deposition that during a doctor visit in the mid-1990s Bare, having read an article on the topic in the local newspaper, asked whether her lung disease could be due to beryllium exposure. But, as noted by the majority, the District Court ignored related testimony by Forry that she could not accurately recall the date of this conversation, and allowed that it may have taken place in the late 1990s. Accordingly, the disputed fact issue — the date when Bare received notice that the defendants' plant may have been the cause of her injury — should be decided by a jury.

I concur also in the result reached as to Mary Russo, but I believe her case is closer than the majority acknowledges. Contrary to the majority's factual analysis, Mrs. Russo's doctors never definitively diagnosed her as not having CBD, much less did they dispel her concern that the defendants' plant was the cause of her injury. Dr. Bell diagnosed her with idiopathic pulmonary fibrosis of an unknown nature, and told her it was unlikely her illness was due to her *employment* at the facility five decades ago. Dr. Mengel confirmed this diagnosis. But there is no evidence any doctor told Mrs. Russo her injury was not caused by her many years of living and working near the defendants' plant, as she evidently suspected. According to Mrs. Russo, "I wasn't happy with that" explanation. "It bothered me because I heard people that didn't even work there had this. They didn't even have to work at [the] plant." Mrs. Russo's suspicion of nonoccupational CBD was derived from information she received from her local newspaper.

While her doctors may not have shared her concern, these articles gave Mrs. Russo adequate information for her to propose to them that she undergo a medical procedure that in the end confirmed her suspicions were correct. Ultimately, however, I do not believe the facts are so clear that reasonable minds cannot differ as to when the limitations period began. Although the March 29, 1999, and April 12, 1999, newspaper articles provide some persuasive evidence Mrs. Russo had notice of the cause of her injury prior to May 29, 1999 — two years before she filed suit — this is too slim a reed on which to rest entirely a finding that her suit is time barred.

As noted above, I join fully the decision concerning John Branco, and thus have nothing further to add.

## IV.   Conclusion

As noted by the majority, in this diversity action our task is to look to Pennsylvania law and predict how the Pennsylvania Supreme Court would decide the case. *Bohus*, 950 F.2d at 924. To that end, the Pennsylvania Supreme Court has cautioned against adopting an approach that "would dramatically expand the discovery rule and open the flood gates to allow anyone with a good faith lack of diligence to claim the benefit of the rule." *Cochran*, 666 A.2d at 250. In this context, while I concur in varying degrees with the determinations of the majority as to plaintiffs Bare, Russo and Branco, I disagree as to Mrs. Debiec. In her case, the majority assigns more importance that would I to Dr. Shuman's 1978 misdiagnosis and less importance than would I to the myriad later events pointing — strongly and clearly — to beryllium (and thus the defendants) as the cause of her condition. The majority holds it is a jury question whether the statute of limitations is tolled until Mrs. Debiec received a positive diagnosis of CBD, even if the prior non-CBD diagnosis did not prevent her — by exercising minimal diligence amidst the wave of information gathered by, *inter alia*, her husband — from learning the cause of her injury. I do not believe this departure from settled precedent would be endorsed by the Pennsylvania Supreme Court, which "ha[s] not hesitated to find as a matter of law that a party has not used

reasonable diligence in ascertaining the cause of an injury[,] thus barring the party from asserting [that] claim under the discovery rule." *Id.* at 248. Therefore, I respectfully dissent with respect to the majority's determination as to Mrs. Debiec.

A True Copy:
Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*